IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

DALE D. DRINKWATER,

     Plaintiff,

v.

DR. LARSON, DR. BURNETT,
DR. HOFTIEZER, DR. SPRINGS,
NURSE BELLIN, NURSE MOERCHEN,

     Defendants.

OPINION AND ORDER

Case No. 16-cv-134-wmc

     This court previously granted *pro se* plaintiff Dale Drinkwater leave to proceed under 42 U.S.C. § 1983, on his Eighth Amendment claims of deliberate indifference and Wisconsin common law negligence against health care professionals working for the Wisconsin Department of Corrections ("DOC"). Specifically, Drinkwater claims that while he was incarcerated at various times between 2011 and 2015, the defendants, Drs. Larson, Burnett, Hoftiezer, and Springs, and Nurses Bellin and Moerchen, failed to take reasonable steps in response to his need for hip surgery during that time frame. Now before the court is defendants' motion for summary judgment (dkt. #55), along with Drinkwater's requests for assistance in recruiting counsel (dkt. ##46, 53, 64, 70). Since the evidence of record does not support a reasonable finding that any of the defendants acted with deliberate indifference or negligence, the court will grant defendants' motion and deny Drinkwater's motions as moot.

## UNDISPUTED FACTS[1]

### A. Parties

Although the events comprising his claims took place while he was incarcerated at multiple DOC institutions between May 2010 and 2015, Drinkwater is no longer incarcerated.  Defendants include:  Dr. Larson, who was working in the Health Services Unit ("HSU") at Fox Lake Correctional Institution ("FLCI") during the relevant time period; Dr. Burnette, a DOC employee who handled a request for a referral to an out-of-contract facility; Dr. Hoftiezer, who treated Drinkwater while he was housed at Dodge Correctional Institution ("Dodge"); Dr. Springs, who treated Drinkwater when he was housed at Redgranite Correctional Institution ("Redgranite"); and registered nurses Bellin and Moerchen, who also treated Drinkwater at Redgranite.

---

[1] Unless otherwise noted, the following facts are material and undisputed.  Consistent with its practice, the court has drawn these facts from the parties' proposed findings and the cited evidence of record, viewed in a light most favorable to Drinkwater.  *Miller v. Gonzalez*, 761 F.3d 822, 877 (7th Cir. 2014) ("We must . . . construe the record in the light most favorable to the nonmovant and avoid the temptation to decide which parties' version of the facts is more likely true."). Defendants argue that since Drinkwater only attempted to dispute nine of their proposed findings of fact, and submitted no contrary, admissible evidence, the court should deem those proposed findings undisputed.  Defendants also accurately point out that Drinkwater largely relies on an unsigned "Updated Chronology of Events" to dispute defendants' proposed findings, while submitting various documents purporting to be his medical records, and referring back to the allegations in his complaint.  (*See* Pl. Disputed Findings of Fact (dkt. #65); Pl. Mot. to Correct Brief (dkt. #78.).)  While the court will deem as undisputed defendants' proposed findings of fact that Drinkwater has not attempted to dispute, the court has taken into account Drinkwater's attempts to dispute certain facts related to what he was told, or what specifically he requested related to his hip surgeries, since his averments about his interactions with defendants may be sufficient to create genuine issues of material fact.

**B. Drinkwater's treatment from Dr. Larson between May 2010 and 2011**

While Drinkwater's claims in this lawsuit focus on events beginning in May of 2010, his earlier medical treatment provides context. Drinkwater had gone through hip replacements in the early 1990s, but he was experiencing ongoing pain. By the time he arrived at FLCI in October of 2009, his hips were in such a bad state that he could no longer walk without crutches. As a result, staff promptly placed him on a chronic pain management plan for bilateral hip pain. Indeed, between his arrival at and release from FLCI, Drinkwater had seven, internal examinations for chronic pain management: November 13, 2009; February 24, 2010; May 27, 2010; June 18, 2010; September 16, 2010; January 19, 2011; and June 2, 2011. FLCI also arranged for several, off-site medical exams and procedures during this same time frame. In addition, Drinkwater was seen by off-site specialists to consider whether Drinkwater's hip condition warranted surgery.

During the November 13, 2009, visit, a nurse saw Drinkwater for concerns about how to manage his pain, hepatitis C and sleep apnea. The nurse also noted that Drinkwater had an upcoming referral with a University of Wisconsin ("UW") orthopedic surgeon for probable hip surgery. At that time, Drinkwater had the following indefinite medical restrictions: no kneeling, low bunk, no floor or boat placement, and first floor placement only.[2]

Drinkwater's first UW appointment took place on or around December 17, 2009. Drinkwater met with Dr. Illgen, who had examined Drinkwater previously. Dr. Illgen's

---

[2] Neither party explains what the "no floor or boat" placement means, but this restriction is not materials to Drinkwater's claims.

treatment note dated December 17, 2009, reflects agreement that Drinkwater may need surgical intervention, but questions whether it was appropriate at that time:

> The difficult problem in this 46-year-old patient is when to proceed with revision surgery. In my opinion although there is significant retroacetabular lysis and polyethylene wear, I do not see definitive evidence for mechanical loosening of the acetabular component. Short of this, I believe that the decision to proceed with revision surgery is one of clinical judgment. Although there may be orthopedic surgeons who review his history, physical examination, and clinical radiographs and recommend revision surgery due to the retroacetabular osteolysis and possibility of reintroducing cross-linked polyethylene, I do not feel this is the case at the present time. I recognize that this is a judgment decision and at the age 46 one could come to a different conclusion. My concern is that his risk of complication is substantial . . . . I do not think that this patient fully understands the complex nature of what revision surgery would entail. There is clearly a difference in opinion regarding the physician in Green Bay. Specifically, he saw Dr. Grossman who felt revision surgery was indicated, but by his note, he was not qualified to actually perform the surgery. . . . We would simply suggest that the complex nature of this patient's problem and the potential for serious complications with revision surgery in my opinion is only warranted if there is definitive evidence for mechanical loosening of the acetabular component or complete wear through the polyethylene liner or instability resulting in frank dislocation.

(Pl. Discovery Ex. (dkt. #65-2) at 18-19.)

On January 6, 2010, a nurse practitioner prescribed Drinkwater 5 mg of methadone to be taken by mouth two times a day, to treat his pain. The nurse practitioner also instructed staff to follow up with UW Orthopedics regarding a second opinion by January 20, 2010, which was done. On January 15, 2010, Drinkwater was measured and fitted for crutches and allowed to use a wheelchair for distance.

On February 23, 2010, Drinkwater refused to go to his appointment with the UW orthopedic surgeon and signed a refusal form. (Def. Ex. 500 (dkt. #58-1) at 4.) Drinkwater does not deny that the refused to see the surgeon that day, but emphasizes

that he did so out of skepticism given Dr. Illgen's hesitance to recommend surgery at that point.

On May 24, 2010, Drinkwater reported falling while taking a shower. Because he was having trouble breathing, Drinkwater was taken to Waupun Memorial Hospital ("WMH"), where he stayed three days and underwent x-rays and received treatment. WMH emergency department physician, Farhat Khan, assessed Drinkwater and diagnosed him with a left hip contusion. Although Drinkwater would dispute it, Dr. Khan concluded that Drinkwater's x-ray did not differ from his x-ray from the prior year. (*See* Ex. 500 (dkt. #58-1) at 94-98, 103.)[3] In any event, it is undisputed that Dr. Khan spoke with Dr. Grossman at WMH and a UW orthopedic surgeon, who collectively determined that a transfer to UW was unnecessary because Drinkwater had not suffered an acute fracture. Dr. Khan further recommended Drinkwater follow-up with the UW surgeon who Drinkwater had seen previously, Dr. Illgen.

However, Drinkwater again declined to see a UW orthopedic surgeon, or at the very least, to see Dr. Illgen. Dr. Khan noted that interaction as follows:

> When this was discussed with patient, he absolutely declines to see any of the UW orthopedic surgeons, also does not want to go back as he claims he is unable to move and he has crutches at the correctional facility . . . . So case was again discussed with Dr. Grossman and it was decided to admit him to medical service on DOC for pain management. Dr. Grossman will see him as a consultant on Wednesday and then we will try to arrange a special

---

[3] Specifically, Drinkwater contends that Dr. Khan did not have a prior x-ray to base his opinion on, but cites no evidence indicating that Dr. Khan did not have access to his prior x-rays. This assertion, based purely on speculation, is insufficient to create a material dispute as to how Dr. Khan assessed Drinkwater's x-ray. *See Brown v. Advocate South Suburban Hosp.*, 700 F.3d 1101, 1104 (7th Cir. 2012) (speculation or conjecture insufficient to raise disputed issue of material fact). Regardless, there is nothing in this record to conclude that DOC medical staff had reason to question Dr. Kahn's conclusions, especially after his consultation with Green Bay and UW Medical staff.

orthopedic care for him at Medical College of Wisconsin or at Mayo Clinic. Patient agrees with that plan.

(Ex. 500 (dkt. #58-1) at 97-98.)  Drinkwater insists that he *was* willing to see other UW orthopedic surgeons, just not Dr. Illgen.  However, there is no evidence that he made this clear to Dr. Kahn, nor to any of the DOC defendants.

On May 26, 2010, Dr. Grossman met with Drinkwater again for a follow up appointment.  In Dr. Grossman's note, he recounted having previously seen Drinkwater and reviewed his x-rays in 2009, as well as his previous recommendation that he see a hip specialist.  Dr. Grossman further noted that Drinkwater was seen by UW, but UW neither recommended nor offered revision surgery as an option at that time.  Dr. Grossman then noted:

> As previously, these problems are difficult to deal with.  Expertise in management of these types of difficulties resides at tertiary or quaternary level referral centers.  I will check with the department of corrections physicians as to what options we have.  I think that, in the short run, pain medication, wheelchair ambulation is about all that we can offer at this point.

(Ex. 500 (dkt. #58-1) at 110-11.)  Dr. Grossman also suggested that because Drinkwater did not want to see a UW specialist, he should see a specialist at Froedtert or Mayo clinic as soon as possible.[4]

Upon his return to FLCI, Dr. Larson saw Drinkwater almost immediately on May 27, and again on June 2, 2010.  On June 2 in particular, Dr. Larson and Drinkwater

---

[4] Again, although Dr. Grossman did not explicitly mention Dr. Illgen, Drinkwater claims that Dr. Illgen was not an adequate option because he was not an "Adult Reconstruction Expert."

discussed whether he wanted to pursue surgery. At that time, Drinkwater indicated he wanted time to consider waiting for surgery until he was out of prison.[5]

Dr. Larson saw Drinkwater once again on June 18, 2010. Drinkwater did not report any increased pain, and Dr. Larson observed no change in his functional capacity. On this occasion, however, Drinkwater expressed interest in undergoing surgery at a facility *other than UW* before his release. Dr. Larson heeded this request, preparing a request for hip removal and replacement at Mayo or Froedtert as follows:

> 46 yo familiar to Dr. Hoftiezer and Burnett through recent discussions. Has bilateral hip prostheses with osteolysis and left pelvic discontinuity. Had been working with UW Ortho for some time, but is currently at odds with his orthopedist there over his care plan. From what Dr. Hoftiezer and the patient have briefed me on, UW ortho is of the opinion that he will need revision of his hip joints eventually, but are not recommending it yet. Patient has been refusing to return to UW ortho for his follow-ups because he doesn't believe they want to fix him as quickly as he wants to be fixed (his [maximum release date] is in about 15 months). He had a recent fall and hip injury and was seen by Dr. Grossman at WMH for it. He [Grossman] suggested that he get his reconstructive hipwork at Froedtert or the Mayo Clinic if he won't return to UW and was concerned his long-term outcome might not be as good if he continued to delay. Grossman contacted Hoftiezer to see if it was possible to send him somewhere besides UW. UW reviewed the patient's recent ER x-rays from his WMH stay, and didn't feel the findings on x-ray warranted urgent intervention. He was offered follow up then, but the patient continued to refuse. Since his arrival at FLCI he has been managing his ADLs independently on Methadone for pain and the use of the wheelchair and crutches. See[n] again today in HSU at FLCI. He remains conflicted about his care plan but had previously admitted that his "strategy" all along was to "try and ride it out" and avoid submitting to any ortho surgeries until he got released and could seek his care at a facility of his choosing. However, today he remains conflicted and implied he would go somewhere other than UW to consider hip surgery before his release if it were offered. Request permission to sen[d] him to Mayo Clinic or Froedtert for another opinion and possible surgery.

---

[5] In his response to this proposed fact, Drinkwater does not dispute that he had this conversation with Dr. Larson. Rather, he simples notes that many other inmates were sent to the Froedtert hospital for special doctors.

(Ex. 500 (dkt. #58-1) at 114-15.)

Because the request required medical review, DOC's regular reviewer, James LaBelle, RN, referred Dr. Larson's request out for "Secondary Medical." In that capacity, Dr. Burnett received the request and declined to approve it the same day. (*Id.*) According to defendants, the DOC typically cannot use Mayo or Froedtert because the DOC is under contract with UW; the only exception being when a UW physician concludes that he or she cannot actually perform the requested medical intervention. (Spring Decl. (dkt. #63) ¶ 30.)

After learning his request was denied, Drinkwater submitted a request to correct his medical records, in which he wrote the "only" thing he would not allow would be his "surgery done by Dr. Illgen," repeating his request to see a doctor from Mayo or Froedtert, but adding "I'm not refusing any and all UWM treatment!" (Pl. Ex. (dkt. #3) at 11.) On July 15, 2010, Dr. Larson denied his request to change the content of this, noting that Drinkwater's record was accurate and complete. (*Id.*)

Dr. Larson next saw Drinkwater again on September 16, 2010, for chronic pain management. At that time Drinkwater did not report any changes in functional status or intensity or character of pain. Accordingly, Dr. Larson continued all special needs and conservative coping measures, and he ordered a follow-up in 3-4 months. Dr. Larson also saw Drinkwater on January 19, 2011, once again for chronic pain management. Drinkwater reported no status changes, other than that he voluntarily weaned his methadone down to 10 mg once a day for five days per week, and he was taking his usual dose two times daily the other two days. Drinkwater nevertheless requested that Dr.

Larson not change his dosage or care plan, a request Larson heeded. Dr. Larson again ordered follow-up in 3-4 months.

On June 2, 2011, Dr. Larson saw Drinkwater for the last time. While Drinkwater stated that his function had not improved, Dr. Larson observed him independently transfer and ambulate on one crutch (a fact Drinkwater does not dispute). Ultimately, Drinkwater refused to let Dr. Larson examine him. Instead, he complained about his care and left abruptly. Accordingly, Dr. Larson maintained his methadone dosage, again ordering follow-up for four months. Dr. Larson did not see Drinkwater again because he was released from DOC custody in September of 2011.

### C. Drinkwater's out-of-custody medical care between September 2011 and January 2012

After his release from prison, Drinkwater he saw a physician on his own at the Mayo Clinic. Dr. Daniel Berry at Mayo opined that Drinkwater would likely benefit from a custom triflange-type component for reconstruction of his left acetabulum. However, the surgery required some lead time, with Drinkwater undergoing a CT scan and surgery scheduled six weeks later. Dr. Berry's examination of Drinkwater in June of 2012 included the following contemporaneous note:

> Mr. Drinkwater is seen in followup today. We have talked about the status of further evaluation for a triflange implant. He understands that computer models have been made, that a plastic model is being made, and that at some point we would need to make a decision about whether to proceed to fabricating an actual implant. He understands there are major economic implications involved in this and that we would not fabricate an implant until we were fairly confident that he will be going ahead with surgery. He understands that we cannot make a decision to go ahead with surgery until such time as we are confident that he has been able to stop smoking, as I

think if he is not able to stop smoking the chances of surgery being successful are dramatically reduced. In those circumstances, I would be concerned that the risk/benefit profile would not be in his favor. He seems to understand this logic.

(Ex. 500 (dkt. #58-1) at 142.)

On August 30, 2012, Drinkwater went to the Mayo Clinic again. Drinkwater had not quit smoking, and thus was not recommended to undergo the triflange implant. Instead, Drinkwater wanted to proceed with resection arthroplasty. Dr. Berry noted the following discussion they had about arthroplasty versus a full reconstruction:

[W]e talked a lot about what a complex reconstruction could give him versus a resection arthroplasty. He understands that both would be aimed at reducing pain although he could have some pain after either. He understands that a resection arthroplasty has a reasonably good chance of being a more definitive operation than a complex hip reconstruction which could fail for a number of reasons. . . . I have talked to him very honestly about what resection arthroplasty is like, what its limitations are, and what the problems are related to it. I have also discussed with him the fact that any reconstruction of his hip certainly is a major undertaking with substantial possibilities of failure of either implant fixation or pelvic healing.

(Ex. 500 (dkt. #58-1) at 143.) Drinkwater's arthoplasty surgery was scheduled for January 2013.

Unfortunately, on January 29, 2013, before surgery could occur, Drinkwater's parole was revoked. He was again returned to DOC custody on February 25, 2013.

## D. Drinkwater's treatment at Dodge between March 2013 and August 2013

On March 5, 2013, during his intake at Dodge, Drinkwater saw an advanced practice nurse prescriber ("APNP"). Drinkwater reported that a Mayo Clinic physician had scheduled him for surgery on January 30, 2013, but that he had been reincarcerated

before that surgery could take place. Drinkwater also told the APNP that he did not object to treatment from UW. The APNP noted that the next step would be to obtain Mayo Clinic's most recent recommendations, and then for further evaluation of Drinkwater's pain management plan with Dr. Hoftiezer.

On March 7, 2013, Dr. Hoftiezer noted that Drinkwater had a failing bilateral total hip arthroplasties and had been seen by multiple orthopedists. Dr. Hoftiezer further noted that the plan for repair was complex and labrum involved pelvic reconstruction. At that time, Drinkwater also expressed that he was okay with waiting until he was released in five months to have surgery performed at Mayo Clinic. In fact, Drinkwater asked to continue his current pain management plan, which was similar to the plan Drinkwater had when he was incarcerated previously. Dr. Hoftiezer continued that plan and ordered follow-up for three months. While Drinkwater does not dispute the substance of this exchange, he also claims that Dr. Hoftiezer told him that there was not enough time to get the surgery done before his release. As a result, Drinkwater concedes that he did not push back.

On March 11, 2013, Drinkwater also reported to an APNP that he intended to follow up regarding hip surgery at Mayo Clinic after his release in six months. (Ex. 500 (dkt. #58-1) at 22.) In response, the APNP ordered a physical therapy evaluation and exercise to decrease further weakness and atrophy as much as possible prior to surgery. Drinkwater started physical therapy on March 18, 2013. While Drinkwater's medical records indicate that he was seen in the HSU for urinary and digestive issues and hemorrhoids, it does not indicate that he ever pressed his health care providers for surgery during this period of incarceration.

On May 31, 2013, Drinkwater saw Dr. Lewandowski, who is not a defendant. In discussing his pain medications, Dr. Lewandowski noted that Drinkwater had been taking: 15 mg of morphine twice per day for two years; 25 mg of amitriptyline at bedtime, which Drinkwater reported fogged his mind during the day; 600 mg of ibuprofen, which bothered Drinkwater's stomach; and acetaminophen from the canteen. Because Drinkwater did not want to increase his morphine from 30 mg to 60 mg a day, they agreed to try 45 mg a day to manage pain until Drinkwater's scheduled release in August of 2013.

As of July 25, 2013, Drinkwater had the following medical restrictions: he was allowed to use a wheelchair for traveling long distances; he had crutches; he was required to sleep on a low bunk; and he could only be assigned to a first-floor cell. Drinkwater was released from DOC custody on August 20, 2013.

### E. Drinkwater's treatment at Dodge and Redgranite between May 2014 and December 2015

Drinkwater was once again returned to DOC custody, at Dodge, in May of 2014. Although he was out of custody for almost 1½ years, Drinkwater had not undergone surgery, and the record contains no evidence suggesting that he pursued it. In June 2014, Dr. Hoftiezer approved Drinkwater's chronic use of morphine sulphate, an opioid pain reliever. Shortly after, Drinkwater was transferred to Redgranite in July 2014, where he was given chronic pain treatment care pain for his hips.

Additionally, in October 2014, Susan Peters, an APNP, submitted a Prior Authorization with UW-Orthopedics or Dr. Grossman at WMH for a consultation related to Drinkwater's hip condition. After that request was approved, Drinkwater underwent x-

rays of his hips at WMH on November 3, 2014. Dr. Grossman compared those x-rays to the 2009 and 2010 x-rays, and noted that Drinkwater would need the expertise of UW-Orthopedics. Accordingly, on November 4, 2014, a different APNP submitted a request for Drinkwater to be seen by UW-Orthopedics.

On December 9, 2014, Nurse Moerchen saw Drinkwater for a check of his urine. During that appointment, Drinkwater asked for the DOC's letter denying him a consult at Mayo Clinic, and Moerchen apparently explained to him that DOC patients have to go to UW for consults.

On January 1, 2015, while still at Redgranite, Drinkwater reports that he stood up, felt as though his right hip went through his pelvis, at which point his leg went numb. On January 2, Drinkwater reported this injury to Nurse Bellin, who conducted an assessment, contacted the on-call advanced care provider, Dr. Krembs, and ordered a follow-up appointment. At that point, Drinkwater appears to have been given some morphine, but his request for more was denied.

A few days later, on January 6, 2015, Drinkwater underwent x-rays. A non-DOC radiologist, Dr. George Morrison, reviewed those x-rays. However, Dr. Morrison reported seeing no significant change between his July 2014 and his January 2015 x-rays, at least with respect to the left hip about which he complained. As a result, Drinkwater alleges that nurses Bellin and Moerchen reviewed the x-rays and told him that nothing was wrong with him. They then sent him back to his unit despite his claims of serious pain.[6] The

---

[6] Other than his own version of their brief exchange on January 6, 2015, Drinkwater has offered no details or evidence as to when those conversations occurred or what was said.

only other involvement of either of these nurses reflected in the evidence of record is that Nurse Moerchen saw Drinkwater about 2 weeks later (after he had already been seen by Dr. Springs and a UW specialist) in his cell due to complaints of hip pain. At that time, she noted no deviation from past reports, but transferred him to the infirmary for monitoring.

In January of 2015, Dr. Springs was responsible for Drinkwater's pain management, and he carried out the recommendations of UW specialists. Specifically, on January 16, Dr. Springs ordered nortriptyline for his pain. Dr. Springs prescribed this medication because Drinkwater had reported that another medication, amitriptyline, was helpful, but that he did not like the side effects. Nortriptyline was similar to amitriptyline, but apparently carried less side effects.

On January 20, 2015, Drinkwater also saw Dr. Heiner at UW-Orthopedics. Dr. Heiner recommended a pelvic CT. He also noted that: "The patient wants to know if he should remain at his current dose of narcotics. Our recommendation is to not escalate his dose, continue where he is until we get sorted out what revision surgery we need to line up." (Ex. 500 (dkt. #58-1) at 175-76.) In response, Dr. Springs submitted an off-site service request for a pelvic CT scan. The UW performed that scan on January 23, 2015, and Drinkwater had a follow-up appointment with UW on January 27, 2015. The next day, on January 28, 2015, Dr. Springs submitted a request for a right total hip replacement, noting that Dr. Heiner had not yet made a recommendation regarding the left hip. Dr. Springs' request was approved by DOC January 29, 2015, and, while Dr. Heiner did not characterize the need for surgery as urgent, staff was accordingly directed to set up

Drinkwater's surgery "soon." While Dr. Springs was aware that the DOC has no real control over the timing of off-site procedures, she avers that she added the word "soon" in an effort to convey to DOC staff and outside providers the urgency of her request.

Before his surgery, Drinkwater told Dr. Springs that he was upset about going to UW-Orthotics for the surgery, since he preferred Mayo Clinic or Froedtert, but Dr. Springs explained again that DOC did not have a contract with those facilities and that he would need to go to UW unless the doctor at UW did not believe himself capable of performing the appropriate procedure. Drinkwater then asked Dr. Springs to follow up with UW to confirm that Dr. Heiner could perform his reconstructive surgery, and Dr. Springs was able to confirm that Dr. Heiner was, indeed, so qualified. Dr. Springs relayed that information to Drinkwater before the surgery, and Dr. Heiner gave Drinkwater a right total hip replacement on May 14, 2015.

Following surgery, Drinkwater was housed temporarily in Dodge's infirmary unit for postoperative care, rehabilitation and wound care. He was discharged and transferred back to Redgranite on May 28, 2015. Drinkwater had a follow-up appointment on June 8, 2015, where it was noted that his wound was healing without redness or drainage, and his staples were removed. Drinkwater was also advised that he would be able to see Dr. Heiner at his next follow up, and on June 15, 2015, Dr. Springs requested that follow-up.

On around August 4, 2015, Dr. Heiner further recommended scheduling Drinkwater for left hip revision, as well as a follow-up for his right hip in a year. Dr. Heiner also examined Drinkwater on August 5. At that time, Drinkwater reported that he was

satisfied with the surgery and confirmed his recommendation of left hip surgery as well. Drinkwater underwent left total hip replacement on November 3, 2015.

Although Drinkwater was discharged from the DOC a short time later, in December of 2015, with a prescription for Tramadol, a change made by a non-defendant, Dr. Joseph, he returned to DOC custody again on November 14, 2016.

Before filing this lawsuit, Drinkwater had filed four Notices of Claim, all in 2010 and 2011. However, he never filed a Notice of Claim in 2015, nor at any other point after October 6, 2011. Finally, Drinkwater named neither Nurse Bellin nor Nurse Moerchen in the notices that he did file.

OPINION

Defendants seek judgment on the merits of plaintiff's Eighth Amendment and negligence claims. Alternatively, they argue that qualified immunity shields them from monetary damages here.

## I. Applicable Standards of Care

A prison official may be held liable under the Eighth Amendment if he or she was "deliberately indifferent" to a "serious medical need." *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). A "serious medical need" may be a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person. *Johnson v. Snyder*, 444 F.3d 579, 584-85 (7th Cir. 2006). A condition does not have to be life threatening to be found "serious," but must at least: "significantly affect[]

an individual's daily activities," *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997); cause significant pain, *Cooper v. Casey*, 97 F.3d 914, 916-17 (7th Cir. 1996); or otherwise subject the prisoner to a substantial risk of serious harm, *Farmer v. Brennan*, 511 U.S. 825 (1994). Here, plaintiff's hip condition, possible need for surgery, and ongoing pain management present serious medical needs. So, the question is whether any of the defendants acted with deliberate indifference to those needs.

"Deliberate indifference" means that the officials are aware that the prisoner needs medical treatment for a serious condition, but choose to disregard that need by consciously failing to take reasonable measures. *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997). Deliberate indifference constitutes *more than* negligent acts, or even grossly negligent acts, but may require something less than *purposeful* acts. *Farmer*, 511 U.S. at 836. The point of division between the two standards lies where (1) "the official knows of and disregards an excessive risk to inmate health or safety," or (2) "the official [is] both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," *and* he or she draws that inference yet deliberately fails to take reasonable steps to avoid it. *Id*. at 837; *see also Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) ("While evidence of malpractice is not enough for a plaintiff to survive summary judgment on an Eighth Amendment claim, nor is a doctor's claim he did not know any better sufficient to immunize him from liability in every circumstance.").

A jury may "infer deliberate indifference on the basis of a physician's treatment decision [when] the decision [is] so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*,

439 F.3d 392, 396 (7th Cir. 2006); *see also Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) ("A prisoner may establish deliberate indifference by demonstrating that the treatment he received was 'blatantly inappropriate.'") (citing *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005)). In *Petties,* the Seventh Circuit acknowledged the difficulty of applying this standard in the medical context, outlining examples of conduct that could support a finding of deliberate indifference: when a doctor refuses to take instruction from a specialist; when a doctor fails to follow an existing protocol; when a medical provider persists in a course of treatment known to be ineffective; when a doctor chooses an "easier and less efficacious treatment" without exercising professional judgment; or where the treatment involved inexplicable delay lacking a penological interest. *Petties*, 836 F.3d at 729-31. As to each defendant, the court is to look at the "totality of [the prisoner's] medical care when considering whether that care evidences deliberate indifference to serious medical needs." *Id.* at 728.

Of course, Wisconsin's standard for proving negligence is less rigorous. To prevail on his claim for medical negligence in Wisconsin, plaintiff must prove "only" that the defendants breached their duty of medical care and plaintiff suffered injury as a result. *Paul v. Skemp*, 2001 WI 42, ¶ 17, 242 Wis. 2d 507, 520, 625 N.W.2d 860, 865; *see also Gill v. Reed*, 381 F.3d 649, 658-59 (7th Cir. 2004). Wisconsin law defines medical negligence as "the failure of a medical professional to 'exercise that degree of care and skill which is exercised by the average practitioner in the class to which he belongs, acting in the same or similar circumstances.'" *Williams v. Thorpe*, No. 08-cv-577, 2011 WL 4076085, at *7 (E.D. Wis. Sept. 13, 2011) (citing *Sawyer v. Midelfort*, 227 Wis. 2d 124,

149, 595 N.W.2s 423 (1999)). To establish a prima facie claim for medical negligence, a plaintiff must show that the provider failed to use the required degree of skill exercised by a reasonable provider, that he was harmed, and that there is a causal connection between the provider's failure and his harm. *Id.* Expert testimony is required to establish the standard of care, unless "the situation is one in which common knowledge affords a basis for finding negligence." *Sheahan v. Suliene*, No. 12-cv-433, 2014 WL 1233700, at *9 (W.D. Wis. Mar. 25, 2014).

## II.     Defendants Acted with Neither Deliberate Indifference Nor Negligence

Applying these standards to the evidence of record, a reasonable trier of fact could not find that any of the defendants were either deliberately indifferent or negligent in handling Drinkwater's serious medical needs.

### A.     Dr. Larson

Drinkwater's primary complaint about Dr. Larson's care is that he should have done more to ensure that he was offered surgery in 2010. Basically, in Drinkwater's view, although admittedly a specialist and more qualified, Dr. Larson should have agreed with him that Dr. Illgen was inadequate and should have arranged for him to have surgery at either Mayo Clinic or Froedtert, or at last by another UW physician. To start, as laid out above, the Eighth Amendment does not entitle prisoners to "demand specific care" or "the best care possible," and instead requires that reasonable measures are taken to address his serious medical needs. *Arnett v. Webster*, 658 F.3d 743, 754 (7th Cir. 2011); *Forbes*, 112

F.3d at 267.  As such, Drinkwater did not have the right to see a doctor of his choice, much less to receive treatment at the facility of his choice.

To be fair, Drinkwater's complaint to Dr. Larson about Dr. Illgen may have some traction had he submitted any evidence that his hesitance to perform surgery in 2010 was *obviously* wrong.  *See Berry v. Peterman*, 604 F.3d 435, 443 (7th Cir. 2010) (nurse not entitled to defer to treating physicians' instructions when confronted with "inappropriate or questionable" practices).  Here, nothing in the record suggests Dr. Illgen's recommendation was wholly lacking in competence.  To the contrary, Dr. Illgen's 2009 recommendation made it clear that the decision not to recommend surgery was a close one, based on a number of factors, and he agreed that another physician may disagree with his recommendation.  Dr. Illgen also did not rule out the possibility of surgery; rather, he categorized his decision as one of professional judgment, and the evidence of record does not suggest this decision was inappropriate.  Moreover, none of the evidence of record suggests that Dr. Illgen's recommendation should have put the Dr. Larson on notice that he was not receiving adequate care at UW Hospital.

To the contrary, Drinkwater's medical records indicate that all of his care providers agreed that his circumstances were complex, without an obvious or permanent solution, even carrying the distinct possibility that another *surgery* could fail.  While Dr. Grossman may have commented in 2009 and 2010 that revision surgery *may* be appropriate, even his recommendations came with the explicit caveat that he was *not* qualified to perform the surgery and that an orthopedic surgeon would need to make the ultimate recommendation.  As such, Dr. Grossman's opinions do not support a reasonable conclusion that Larson

should have questioned Dr. Illgen's 2010 opinion, who *was* an orthopedic surgeon and hesitated to recommend surgery.

Even assuming that Dr. Larson should have doubted Dr. Illgen's recommendation once questioned by Dr. Grossman, Drinkwater ignores the undisputed fact that Dr. Larson facilitated his wishes to see a doctor at Mayo Clinic or Froedtert within weeks of Dr. Grossman's recommendation for a referral and within days of Drinkwater's June 2, 2010, specific request for a referral. So, he did not stand in the way of Drinkwater's wish to go to those facilities. Rather, it was *Dr. Burnett* who ultimately did not approve that request because the DOC's contract with UW precluded Drinkwater from receiving treatment at another facility. Further, Drinkwater does not dispute that treatment at UW was a possibility, nor does he dispute that Dr. Larson had no control over whether he could be seen at another facility. Instead, Drinkwater claims that he did not refuse *all* treatment at UW, just treatment by Dr. Illgen. That does not change the fact that Drinkwater's only documented request for a referral was to Mayo or Froedtert, and Dr. Larson tried to get him there, even though Larson's request was ultimately denied. As the Court of Appeals for the Seventh Circuit has acknowledged, bureaucracies like the DOC divide tasks, and Dr. Larson cannot be held liable for Dr. Burnett's decision. *See Minix v. Canarecci*, 597 F.3d 824, 833-34 (7th Cir. 2010) ("[I]ndividual liability under § 1983 requires personal involvement in the alleged constitutional violations."). Accordingly, Dr. Larson is entitled to judgment in his favor on Drinkwater's claims related to his request for an earlier surgery.

Finally, a review of Dr. Larson's other treatment decisions for Drinkwater confirms that he provided him with diligent and thoughtful treatment in other respects as well. Dr.

Larson met with Drinkwater six times between May 2010 and June 2011. He prescribed Drinkwater pain medication and worked with Drinkwater to adjust his dosage, engaged in ongoing discussions about the possibility of surgery, and directed various medical restrictions accommodation so that Drinkwater would have the ability to move in and out of bed and around the prison as needed without additional pain. This type and level of responsiveness does not support a reasonable inference that Dr. Larson deviated from an acceptable standard of care, much less breached a duty of care, in responding to Drinkwater's need for assessments and pain medication for his failing hip replacements. Accordingly, Dr. Larson is entitled to judgment on Drinkwater's claims against him.

### B. Dr. Burnett

Moreover, even though Dr. Burnett was ultimately responsible for denying Dr. Larson's request for a referral to a different hospital group, Drinkwater has submitted no evidence to support a reasonable trier of fact finding that his denial exhibited deliberate indifference. Certainly, as the Court of Appeals for the Seventh Circuit has held, the failure to provide treatment based on cost could support a reasonable finding of deliberate indifference. *See Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018) ("Failing to provide care for a non-medical reason, when that care was recommended by a medical specialist, can constitute deliberate indifference."). Yet the potential cost of sending Drinkwater to a facility beyond UW was not the reason for Dr. Burnett's decision. Instead, the evidence of record suggests that Dr. Burnett had no reason to doubt the competency of Dr. Illgen (or more broadly, the UW Orthopedics Surgery Group) to address Drinkwater's medical

needs, whether assessing his need for or performing a hip replacement, and thus Drinkwater's treatment did not require an out-of-contract care provider. Indeed, none of Drinkwater's medical records indicate that any other care provider (before *or* after June 2010) determined that Dr. Illgen's assessments about Drinkwater's condition were outside the reasonable bounds of professional judgment, much less that reliance upon them would constitute deliberate indifference. Accordingly, Dr. Burnett had a legitimate, medically-driven basis upon which to deny Dr. Larson's request: there was a care provider at UW capable of handling Drinkwater's care. Accordingly, on this record, a reasonable juror could not conclude that Burnett acted with deliberate indifference or negligence.

### C.     Dr. Hoftiezer

Drinkwater next claims that he did not push to undergo surgery during his incarceration between March and August of 2013 because Dr. Hoftiezer told him that five months was not enough time to complete the surgery.[7] The Seventh Circuit has held that a complete failure to start treatment for a serious medical need *only* because a prisoner

---

[7] Drinkwater also takes issue with defendant's assertion that his planned surgery at Mayo Clinic scheduled to take place in January 2013, did not proceed because he had been arrested and his parole revoked. Instead, he asserts that he maintained his disability status and informed the jail staff that his surgery was scheduled, but no one made any effort to transport him to the Mayo Clinic. Setting aside the fact that Drinkwater supported this assertion with an unsigned document (*see* dkt. #65-3 at 2), nothing in the document suggests that any of the *defendants* were in any position to ensure his release to the Mayo Clinic in time for surgery. The evidence suggests that his surgery was scheduled for January 30, while he was not back in DOC custody until February 25, 2013. Nor has Drinkwater submitted evidence suggesting that the defendants were in a position to reschedule his Mayo Clinic surgery once incarcerated. Accordingly, no reasonable fact finder could conclude that any of the defendants acted with deliberate indifference because Drinkwater's own revocation caused him to miss his scheduled surgery.

would be released within six months could constitute deliberate indifference. *See Mitchell*, 895 F.3d at 501-02. That scenario does not apply to Dr. Hoftiezer's treatment.

Even accepting Drinkwater's version of their conversation as true for purposes of summary judgment, Drinkwater does not deny that he ultimately agreed to delay the surgery until his impending release date, when he could go to the Mayo Clinic as planned, which was also his preference. Nor does Drinkwater dispute that beyond discussing the possibility of surgery, pre- or post-release, Dr. Hoftiezer went through his chronic pain treatment plan with him and continued his previous medications. While Drinkwater complains about his continued use of opioids to treat his pain, no reasonable fact finder could on this record conclude that Dr. Hoftiezer's treatment exhibited either deliberate indifference or negligence. If anything, the evidence suggests only that Dr. Hoftiezer took the same approach to Drinkwater's prescriptions as Dr. Larson took during his previous incarceration. Furthermore, the record shows that Drinkwater still was subject to the same medical restrictions during his 2013 period of incarcerated as well, eliminating any reasonable suggestion that Dr. Hoftiezer simply ignored Drinkwater's medical needs.

With respect to the surgery question in particular, Drinkwater's position appears to have changed between 2013 and the present day. When he met with Dr. Hoftiezer in March of 2013, Drinkwater acknowledges that he agreed to pursue surgery at Mayo Clinic upon his release from incarceration, rather than deal with the DOC's bureaucracy. However, Drinkwater now suggests that had he known being on community supervision is considered "custody," his conversation with Dr. Hoftiezer would have gone differently. (Pl. Disputed Facts (dkt. #65) at 2.) This revisionist history is problematic for Drinkwater

on a number of levels. First, as disclosed, Dr. Hoftiezer had no control over decisions made by others while Drinkwater was on supervision. Second, Drinkwater does not dispute that his discussion with Dr. Hoftiezer was on the pros and cons of proceeding with surgery at the UW under DOC direction and control or proceeding with a provider of his own choice a few months later, rather then a flat denial of surgery by Hoftiezer. Third, the fact that Drinkwater admits that he agreed with Dr. Hoftiezer, and only later changed his mind, undermines his challenge to Dr. Hoftiezer's approach to his care.

Even if Drinkwater could challenge Dr. Hoftiezer's medical advice in March of 2013, he still had the burden to show that Dr. Hoftiezer failed to exercise professional judgment in concluding that Drinkwater could wait to undergo surgery. *See Mitchell*, 895 F.3d at 501-02 (factual disputes related to whether defendant exercised professional judgment in denying a request for hormone treatments months before release from prison precluded a finding a summary judgment). That is a burden Drinkwater cannot meet. To start, even the records from the Mayo Clinic reflecting Dr. Berry's surgery recommendation from August 2012 cautioned hesitation and made no mention of an urgent need for surgical intervention. (*See* Ex. 500 (dkt. #58-1) at 143 ("I have talked to him very honestly about what resection arthroplasty is like, what its limitations are, and what the problems are related to it.").) On the flip side, Drinkwater's subsequent interactions with the APNP at Dodge, when he relayed his willingness to undergo physical therapy to ready his body for surgery after his release, suggests that Drinkwater was on board with Dr. Hoftiezer's recommendation and was capable of engaging in physical therapy.

Moreover, when Drinkwater was released from DOC custody in August of 2013, Drinkwater did not actually follow up with the Mayo Clinic and undergo surgery. While the record does not contain evidence as to why Drinkwater did not pursue surgery, the fact that he did not, and that the record is devoid of any evidence discrediting Dr. Hoftiezer's assessment that he could wait a few months to undergo surgery at Mayo, is wholly insufficient for a reasonable fact finder to infer that Dr. Hoftiezer failed to exercise professional judgment in concluding that a delay in surgery until his release would be in Drinkwater's best interest. As such, even accepting that Dr. Hoftiezer dissuaded Drinkwater from pursuing surgery between March and August of 2013, the totality of the care Dr. Hoftiezer provided Drinkwater would not permit a fact finder to conclude that Dr. Hoftiezer was either deliberately indifferent or negligent in his care.

### D.     Dr. Springs

The evidence of record related to Dr. Springs' treatment readily warrants judgment in her favor as well. Dr. Spring did not even start handling Drinkwater's requests for care until 2015, when Drinkwater was once again incarcerated, this time at Redgranite. At that time, Dr. Springs' involvement was straightforward and by all accounts appropriate: she adjusted Drinkwater's medication to alleviate unwanted side effects, followed Dr. Heiner's recommendation by requesting a CT scan, and submitted the request for right total hip replacement, which was ultimately approved. Furthermore, when Drinkwater expressed doubts about Dr. Heiner's qualifications to perform a total hip replacement, Dr. Springs followed up to assure that Dr. Heiner could perform that surgery. Finally, Dr. Springs

handled Drinkwater's follow-up care after his surgery. Drinkwater offers *no* evidence that raises questions as to Dr. Springs' treatment decisions, nor that suggests she was either deliberately indifferent to his need for surgery or pain medication or breached some duty of care. As such, judgment will also be entered in her favor.

### E.   Nurses Bellin and Moerchen

Finally, while the court granted Drinkwater leave to proceed on his claims against nurses Bellin and Moerchen for their handling of his complaints about pain and for their alleged misreading of his x-rays in January of 2015, he has not come forward with any evidence related to his interactions with Bellin and Moerchen that would support a reasonable trier of fact finding that either nurse acted with deliberate indifference or negligently, despite being expressly warned that this would be his burden at summary judgment and trial.

Instead, the evidence of record shows that during the time frame the nurses would arguably have had access to Drinkwater's January 2015 x-rays, the reviewing physician, Dr. Morrison, had already concluded that there were no significant changes with respect to his left hip. Accordingly, even assuming that Bellin and Moerchen told Drinkwater that there was no change in his x-rays since July 2014, they were entitled to rely on Dr. Morrison's January 2015 medical judgment to that effect. *See Holloway v. Delaware Cty. Sheriff's Office*, 700 F.3d 1063, 1075 (7th Cir. 2012) ("[N]urses may generally defer to instructions given by physicians" unless "it is apparent that the physician's order will likely harm the patient."); *Berry v. Peterman*, 604 F.3d 435, 443 (7th Cir. 2010) (nurse had obligation to

follow up with appropriate personnel when presented with problematic treatment decision).

With respect to how Nurses Bellin and Moerchen handled Drinkwater's complaints of pain, the evidence further indicates no basis for a finding of negligence, much less deliberate indifference. Indeed, Moerchen's only interactions with Drinkwater during this time frame involved her telling Drinkwater that he would need to go to UW for a consult, and later transferring him to the infirmary for monitoring after Drinkwater reported that he was experiencing increased pain. As for Bellin, defendants came forward with evidence showing that on January 1, 2015, when Drinkwater reported feeling his hip "go through his pelvis," Bellin conducted an initial assessment and referred Drinkwater to the on-call, advanced care provider. These actions, none of which Drinkwater disputes, do not support a finding of deliberate indifference as to either Bellin or Moerchen by any reasonable trier of fact.

At this stage, Drinkwater had to come forward with more than a "scintilla of evidence" to support his claims. *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Since Drinkwater has not even produced a scintilla of evidence to dispute either Bellin's and Moerchen's version of his interactions with them, it would be unreasonable for a fact finder to conclude that either of them acted with deliberate indifference to his serious medical needs.[8]

---

[8] Defendants also assert that they are entitled to qualified immunity on the merits of Drinkwater's Eighth Amendment claims. Although Drinkwater failed to cite any legal authority suggesting that those particular rights were clearly established between 2010 and 2015, the court need not reach

Finally, Drinkwater's negligence claims under Wisconsin law against Bellin and Moerchen also fail, not only because the evidence of record does not suggest that they breached this duty of care, but also because Drinkwater failed to submit a notice of claim as required by Wis. Stat. § 893.82. To bring a claim against *any* non-physician defendant, plaintiff must file a notice of claim with the Attorney General to commence suit for injury or damage against a state officer, employee or agent for any action growing out of or committed in the course of their duties.

> [N]o civil action or civil proceeding may be brought against any state officer, employee or agent for or on account of any act growing out of or committed in the course of the discharge of the officer's, employee's or agent's duties . . . unless within 120 days of the event causing the injury, damage or death giving rise to the civil action or civil proceeding, the claimant in the action or proceeding serves upon the attorney general written notice of a claim stating the time, date, location and the circumstances of the event giving rise to the claim for the injury, damage or death and the names of persons involved, including the name of the state officer, employee or agent involved.

Wis. Stat. § 893.82(3). Moreover, compliance with this statute is a prerequisite to proceeding with such a claim against a state official. *See Weinberger v. State of Wisconsin*, 105 F.3d 1182, 1188 (7th Cir. 1997) ("Section 893.82 is jurisdictional and *strict* compliance is required."); *Ruh v. Samerjan*, 816 F. Supp. 1326, 1330 (E.D. Wis. 1993) (citing *Ibrahim v. Samore*, 118 Wis. 2d 720, 726, 348 N.W.2d 554 (1984)) (same). Since it is undisputed that Drinkwater failed to file a notice of claim against Bellin or Moerchen, they are both entitled to summary judgment on his state-law claims.

---

this question since the undisputed evidence of record does not support a reasonable finding that defendants acted with deliberate indifference to his serious medical needs.

### III. Requests for Assistance in Recruiting Counsel

Finally, the court will deny Drinkwater's renewed requests for assistance in recruiting counsel as moot. In his motions, Drinkwater explains that he has been released from prison and has lost access to the law library; his prisoners litigation handbook is no longer helpful; and this court previously noted that resolving this case may require expert testimony. Upon review of the evidence of record and Drinkwater's submissions, however, the court continues to believe that the complexities of responding to defendants' motion for summary judgment did not exceed Drinkwater's abilities. *Pruitt v. Mote*, 503 F.3d 647, 654-55 (7th Cir. 2007).

As an initial matter, the court is unpersuaded that Drinkwater's release from prison made it *more* difficult for him to prosecute his claims. If anything, his release from prison afforded him access to a broader universe of resources, including public libraries, internet resources and other individuals, as well as private counsel. Furthermore, beyond asserting that he no longer has access to the prison's law library, Drinkwater has not actually articulated *why* he has been unable to access these other potential resources.

More fundamentally, the issues material to defendants' motion for summary judgment were not so complex that Drinkwater needed expert testimony to respond adequately. Rather, as set forth above, the material issues required a review of Drinkwater's medical records and treatment preferences over time, along with the recommendations and care that Drinkwater received from a number of different specialists in and out of incarceration. Certainly, the evaluation of Drinkwater's medical records related to his x-rays may have changed this calculus were they a linchpin to his claims against the

defendants in this lawsuit, but since each of the defendants here were entitled to defer to the contemporaneous recommendations of medical specialists, who interpreted those x-rays, their import was not at all central to plaintiff's claims. While the court surmised earlier in this lawsuit that expert testimony *might* become necessary as this case progressed, however, that ultimately proved not to be the case.

Finally, while defendants point to procedural inadequacies in Drinkwater's filings, those filings do *not* support a finding that he was ill-equipped to respond to defendants' motion. Specifically, Drinkwater's filings and opposition brief, while short and to the point, indicate: his memory of events is adequate; he understands the nature of his claims; and he has been able to gather many of his medical records in an effort to prosecute those claims. For instance, he has been able to offer evidence related to his central claim: that he was not rejecting all UW treatment providers, just Dr. Illgen. Finally, given that the court's analysis of defendants' motion afforded Drinkwater substantial leniency in light of his *pro se* status (on top of construing every reasonable inference in his favor), the court remains confident that Drinkwater did not need the assistance of an attorney to oppose defendants' motion for summary judgment.

ORDER

IT IS ORDERED that:

1. Defendants' motion for summary judgment (dkt. #55) is GRANTED.

2. Plaintiff's motions for assistance in recruiting counsel (dkt. ##46, 53, 64, 70) are DENIED as moot.

3. Plaintiff's motion for correction (dkt. #78) is GRANTED.

4. Defendants' motion to stay case deadlines and trial dates (dkt. #76) and plaintiff's motion for extension (dkt. #77) are DENIED as moot.

5. The clerk of court is directed to enter judgment in defendants' favor and close this case.

Entered this 5th day of April, 2019.

BY THE COURT:

/s/

WILLIAM M. CONLEY
District Judge